**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **ERIC MYREE PERKINS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     CIVIL ACTION NO. 13-00286-KD-B |
| | ) |
| **KUSHLA WATER DISTRICT;** | ) |
| **WILLIAM SILVER, Individually;** | ) |
| **ROY KING, Individually; and** | ) |
| **JAMES TODD, Individually,** | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

Eric Myree Perkins claims that based on his race (African-American) he was

discriminated against by Kushla Water District, Chairman of the Board William Silver, and

employees Roy King and James Todd concerning the terms and conditions of his employment.

Perkins also contends that he was subjected to a racially hostile work environment and

retaliated against for filing an EEOC complaint.

The matter is now before the Court on the motion for summary judgment filed by

defendants Kushla Water District, William Silver, Roy King, and James Todd (the defendants)

(docs. 38-42), the response in opposition and documents in support filed by *pro se*[1] plaintiff

Eric Myree Perkins (Perkins) (doc.44), and the defendants' reply (doc. 47). Upon

---

[1] Since Perkins is *pro se*, the Court construes his "pleadings more liberally than those of
a represented party." *Loren v. Sasser,* 309 F.3d 1296, 1301 (11th Cir.2002). However, the
Court does not have "license to serve as *de facto* counsel . . . or to rewrite an otherwise
deficient pleading in order to sustain an action." *GJR Investments, Inc. v. County of Escambia,
Fla.,* 132 F.3d 1359, 1369 (11th Cir.1998)*overruled on other grounds see Randall v. Scott,* 610
F.3d 701, 709 (11th Cir.2010) (citations omitted).

consideration, and for the reasons stated herein, the defendants' motion is **GRANTED**.[2]

## I. Findings of Fact[34]

The Kushla Water District (the District) is "a public utility organized pursuant to the laws of the State of Alabama." (Doc. 16, p. 1)  The District is a "non-profit corporation organized under the laws of the State of Alabama to provide rural water service in a portion of Mobile County." (Doc. 41-1, p. 2) The District is operated under the direction of an eight-member Board of Directors (the Board).  Defendant William Silver is the Chairman of the Board.  The District has always had less than fifteen (15) employees. (Doc. 41-1,  ¶ 5)

Perkins who is African-American applied for a position as a Water Operator Trainee.[5]

---

[2] Defendants object to the Court's consideration of the transcripts of four audio recordings of conversations between Perkins and defendants or other District employees or Board members on basis that the transcripts are unverified, without certification, and contain unsworn hearsay testimony. (Doc. 43, motion to strike exhibits XL, XLI, XLII and XLIII).  Upon consideration, the motion is **DENIED.**  Perkins states that the transcripts were made from his recordings of his own conversations. Although there is no transcriber's verification or certification as to the authenticity and accuracy of the transcript, Perkins likely could produce such a verification or certification. *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1293–94 (11th Cir.2012) ("a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form") (quoting *Macuba v. Deboer,* 193 F.3d 1316, 1322 (11th Cir.1999)).

Additionally, an exception to the hearsay rule may apply.  Federal Rule of Evidence 801(d)(2)(D) explains that an opponent's statement is not hearsay if the statement is offered against an opposing party and the statement "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]" Fed.R.Evid. 801(d)(2)(D); Fed. R. Civ. P. Rule 56(c)(2) (stating that a proper objection would be that "a fact cannot be presented in a form that would be admissible in evidence").

[3] The Court has made its determination of facts by "view[ing] the facts and draw[ing] all reasonable inferences in the light most favorable to the nonmoving party." *Goodman v. Kimbrough,* 718 F.3d 1325, 1331 (11th Cir.2013).

[4] In his complaint, Perkins alleged a list of complaints about his treatment while employed by Kushla Water District.  In response to the Defendants' motion for summary judgment, Perkins has limited his complaints to not receiving a raise, write-ups that he received and the inequitable application of the District's cell phone and work hours policies.

The Board's Personnel Committee at the time Perkins was interviewed consisted of three Board members: Nathaniel Cotton (African-American), Archie Wright (African-American), and Tommy Vice (Caucasian). (Doc. 41-1, Affidavit of William Silver, ¶¶ 2-5) The Board approved hiring Perkins as a Water Operator Trainee at the October 11, 2011 meeting. Perkins was also hired to read the water meters. When Perkins was employed he was the only non-white employee. (Doc. 15, p. 4) At the same meeting the Board also hired Lenora George as a secretary/bookkeeper and Larry Smith as a part-time employee for relief in the office[6] and meter reading. (Doc. 41-1, Silver Affid. at ¶¶ 2-5: Doc. 41-1, p. 9)

The District already employed defendant James Todd as the office manager, defendant Roy King, a "contract employee" as the Superintendent, Charles Skipworth as a part-time meter reader, and William Joe Manley as a full-time employee.[7] (Id., ¶¶ 5-6, Doc. 41-2, Affidavit of Roy King).

Perkins began work on November 3, 2011. On December 7, 2011, Defendant Todd issued an Employee Warning Notice to Perkins. The Notice indicates that the "Type of Violation" was "time allowed for meters." The word "warning" was marked through and the word "interview" written in. "Oral" was checked. The interview lasted 8 minutes. Defendant

---

[5] A list of Water Operator duties was attached to Perkins' application for the Water Operator II license. (Doc. 41-5, p. 4) Perkins was responsible for the well pumps, the well records and logs, the well operation including water quality and monitoring chlorine, flushing the water system, and addressing water quality issues with the customers. Perkins obtained his water operator certification as a Water Grade II on September 1, 2012. (Doc. 41-7, p. 2)

[6] Larry Smith is a retired accounting manger who previously worked at International Paper Company. He has an accounting degree from Auburn University. (Doc. 39, p. 3)

[7] Defendants did not specifically identify Manley's position. From Perkins description, Manley appears to have read meters, installed served and performed maintenance work on the meters and water system.

Todd signed as "Supervisor" and the "action to be taken" was that Todd would "observe future performance." Perkins wrote on the warning: "This is my first introduction/discussion on this matter. I would like an opportunity to clean up some sites before reading again." (Doc. 44, p. 21)

On December 8, 2011, Perkins showed the Notice to King. (Doc. 44, p. 11) King told Perkins[8] that Todd was "not supposed to" "write up" Perkins. (*Id*., p. 11-12). King expressed his opinion that Todd should have discussed the matter with King before he gave the Notice to Perkins since King was Perkins' immediate supervisor. (*Id*., p. 12-13)[9] Perkins acknowledged that when he was hired, he was told that meter reading would be one of his responsibilities. (*Id*., p. 12) King contacted Board Members and Personnel Committee members Vice and Wright to clarify that he was Perkins' supervisor. (*Id.,* p. 12-14) King also discussed with Vice and Wright that this was Perkins first time to read meters, that he was not going to read fast, that Perkins took an extra day, and that he did not think it was right for Todd to issue the Notice. (*Id.*, p. 12-14)

Perkins worked from 8:00 a.m. until 4:00 p.m. during the first six months of employment. (Doc. 44, p. 19) On meter reading days, Perkins hours were initially 6:30 a.m. to 2:30 p.m. (Doc. 41-1, p. 5). In May 2012, Perkins hours were changed to 8:00 a.m. until 4:30 p.m., when King instructed Perkins that he had to take a thirty-minute lunch and leave at 4:30 p.m. (Doc. 41-2, p. 3) At the July 24, 2012 Personnel Committee meeting, Perkins complained

---

[8] Perkins recorded his conversation with King. (Doc. 44, p. 11)

[9] In his affidavit, King stated that "[a]ll employees were under the supervision of James Todd while performing meter reading." (Doc. 41-2, p. 2) At that time, the other meter readers were Skipworth and Larry Smith. James Todd was also the office manager and supervised Smith when he worked in the office.

that his hours were changed. King responded that the Board had set the hours of 8:00 a.m. until 4:30 p.m. with a thirty-minute lunch. (Doc. 44, p. 18)

The District has a cell phone usage policy that all employees are required to read and sign. (Doc. 41-3, George Affid. at ¶ 6) On July 24, 2012, King brought Perkins before the Personnel Committee for refusing to sign the District's cell phone usage policy. (Doc. 44, p. 16) Perkins signed the policy that day. (Doc. 41-3, p. 8) There is no record of any personnel action taken against Perkins for initially refusing to sign the policy.

There is no evidence that Larry Smith, who was hired at the same time as Perkins, ever signed a cell phone policy. However, Lenora George also signed the policy on July 24, 2012. (Doc. 41-3, p. 7) Before Perkins was hired, Skipworth and Manley had signed the policy on March 31, 2009, and former employee Rachel Winslett had signed the policy on March 26, 2010. (Doc. 41-3, p. 4-6) Todd signed the policy on September 20, 2012. (Doc. 41-3, p. 9) Another employee who was hired after Perkins, Daryl Taylor signed the policy on November 16, 2012. (Doc. 41-3, p. 10)

On August 22, 2012, Perkins filed a Charge of Discrimination based on race with the Equal Employment Opportunity Commission. (Doc. 41-6) Perkins complained that he had been harassed by his supervisors and co-workers and cited a list of complaints including not being certified by King for the Water Operator position, receiving the December 2011 write-up and having King fill his personnel file with rumors and lies, having his work hours changed, being required to sign the cell phone policy and the failure of the District to enforce the cell phone policy. Perkins also claimed that he, not Larry Smith, was hired to work in the office.

(Doc. 41-6)[10]

On September 14, 2012, Silver, King and Todd signed a memorandum to Perkins and Manley which set forth as follows:

> Board Policy has set your work hours as follows: 8:00 a.m. to 4:30 with a 30 minute lunch.
>
> It has also set the meter reading hours as 6:30 a.m. to 3:00 p.m. with a 30 minute break on the meter reading route.[11]

(Doc. 41-1, p. 11) The memorandum also states that Todd would supervise Perkins and Manley as to their meter reading duties.

On September 19, 2012, Todd issued Perkins an Employee Warning Notice. The Notice indicates that Perkins was late for work and "did not report until 6:45 a.m.", failed to follow instructions because he "did not install and use platform on rear bumper of truck" and violated company policies because he "did not take lunch period during the day while on route as required" and "left work at 2:30 p.m." Perkins did not sign this Notice. (Doc. 44, p. 22)

On September 20, 2012, Todd issued Perkins another Employee Warning Notice. The Notice indicates that Perkins was late for work and "reported for work at 7 a.m.", failed to follow instructions because he "did not use readers platform", and violated company policies because he "did not take lunch period on route" and "left work at 2:30 p.m." Perkins did not sign this Notice. (Doc. 44, p. 24)

On September 21, 2012, Todd issued Perkins another Employee Warning Notice. The Notice indicates that Perkins failed to follow instructions because he "did not use platform" and

---

[10] Perkins has failed to pursue this claim in his response to the motion for summary judgment. The Court has addressed only those allegations briefed in his response.

[11] It is unclear how many day of the month were devoted to meter reading.

violated company policies because he "did not take lunch period on route" and "left work at 2:30 p.m." Perkins did not sign this Notice. (Doc. 44, p. 23)

On September 25, 2012, Todd issued Perkins another Employee Warning Notice. The Notice indicates that Perkins failed to follow instructions because he "did not use platform" and violated company policies because he "did not take lunch period on route" and "left office at 2:30 p.m." Perkins did not sign this Notice. (Doc. 44, p. 25)

On September 26, 2012, Todd issued Perkins another Employee Warning Notice. The Notice indicates that Perkins failed to follow instructions because he "did not use platform" and violated company policies because he "did not take lunch period on route" and "left office at 2:30 p.m." Perkins did not sign this Notice. (Doc. 44, p. 26)

On September 27, 2012, Todd issued Perkins another Employee Warning Notice. The Notice indicates that Perkins failed to follow instructions because he "did not use platform" and violated company policies because he "did not take lunch period on route" and "left office at 2:30 p.m." Perkins did not sign this Notice. (Doc. 44, p. 27)

On September 28, 2012, Todd issued another Employee Warning Notice. The Notice indicates that he failed to follow instructions because he "did not use platform" and violated company policies because he "did not take lunch period during the period between 6:30 a.m. and 2:30 p.m." and "left office at 2:30 p.m." Perkins did not sign this Notice. (Doc. 44, p. 28)

On October 1, 2012, Perkins filed a second Charge of Discrimination based on retaliation. Perkins stated as follows:

> On August 22, 2012, I filed charge number 420-2012-02894 against the above named employer. Since filing my charge I have been retaliated against by the employer. The employer has changed the meter reading times from 8:00 – 4:30 to 6:00 – 2:30. I was told these hours are policy; however, I am not aware of any policy that sets the time to read meters. The employer is trying to force me into using a device on the truck that I am required to stand on to read meters.

This device causes me to become dizzy and has no safety harnesses. The employer will not supply a respirator when I am required to work with chlorine.

(Doc. 41-8)

On October 22, 2012, Perkins resigned from the District effective immediately. Perkins explained that he hoped to be with the company for many years but now felt that he was not welcome. Perkins wrote that the "policy changes to harass me solely have become burdensome. It is clear that the hostility and harassment will never cease and I am moving on." (Doc. 41-9)

## II. Conclusions of Law

### A. Summary judgment standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a party raises the assertion "that a fact cannot be or is genuinely disputed", the party must

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)(B).

The defendants, as the parties seeking summary judgment bear "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Clark,* 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986)).

Once the defendants have satisfied their responsibility, the burden shifts to Perkins, as the non-movant, to show the existence of a genuine issue of material fact. *Id.* "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505 (1986)); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-159, 90 S. Ct. 1598, 1608-1609 (1970). However, a "moving party is entitled to summary judgment if the nonmoving party has 'failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" *In re Walker*, 48 F. 3d 1161, 1163 (11th Cir. 1995) (quoting *Celotex Corp.*, 477 U.S. at 323, 106 S. Ct. at 2552). Overall, the Court must "resolve all issues of material fact in favor of the [non-movant], and then determine the legal question of whether the [movant] is entitled to judgment as a matter of law under that version of the facts." *McDowell v. Brown*, 392 F.3d 1283, 1288 (11th Cir. 2004) (citing *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003)).

However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004). "An issue of fact is material if it is a legal

element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (citation omitted).

### III. Analysis

In the amended complaint, Perkins alleges as follows:

> This is an action to recover actual, compensatory, liquidated, and punitive damages under the Fourteenth Amendment to the United States Constitution, under the Civil Rights Act of 1964, under the Civil Rights Act of 1991, under 42 U.S.C. § 1981 and under 42 U.S.C. § 1983.

(Doc. 15, p. 1)

### A. The Fourteenth Amendment and 42 U.S.C. § 1983 – Claims against state actors

Perkins alleges that defendants violated his rights under the Fourteenth Amendment and 42 U.S.C. § 1983.  However "both the Fourteenth Amendment and 42 U.S.C. § 1983 provide a cause of action only against state governments and state actors." *Shell v. HUD,* 355 Fed.Appx. 300, 304 (11th Cir.2009); *Griffin v. City of Opa–Locka,* 261 F.3d 1295, 1303 (11th Cir.2001)(To succeed on a cause of action brought pursuant to § 1983, Perkins "must show that he . . . was deprived of a federal right by a person acting under color of state law.")

Defendants move for summary judgment on basis that Perkins' "§ 1983 claims are inapplicable to these Defendants and due to be dismissed." (Doc. 39, p. 11)

Perkins did not allege in his complaint that the defendants were acting under color of state law but instead alleged only that the District was a "public utility".  (Doc. 15)  Moreover, since Perkins did not respond to this argument on summary judgment, he has presented no evidence or legal argument that supports his claim that the District or any other defendant was acting under color of state law.  (Doc. 44)   The Court finds that Perkins has abandoned his

claims brought pursuant to 42 U.S.C. § 1983. Therefore, defendants are entitled to summary judgment as to any claim or cause of action brought pursuant to § 1983.

### B. Title VII of the Civil Rights Act of 1991

Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To be an "employer" within the meaning of Title VII, the District must "have fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C.A. § 2000e(b).

Defendants argue that the District is not an employer as defined in 42 U.S.C. § 2000e-2(a)(1) because it does not have the requisite number of employees.  In support, the District provides Silver's affidavit as to the number of employees.  Perkins did not respond to this argument. As plaintiff, he has the threshold burden to demonstrate that the District has the requisite number of employees. *See Lyes v. City of Riviera Beach,* 166 F.3d 1332, 1340–41 (11th Cir.1999). Therefore, the District is entitled to summary judgment as to any claim or cause of action based on Title VII because it does not have the requisite number of employees.

Perkins did not respond to defendants Silver, King and Todd's argument that as a matter of law, there is no individual liability under Title VII.  The defendants are correct. Individual employees and board members are not subject to liability under Title VII. *See Dearth v. Collins,* 441 F.3d 931, 933 (11th Cir.2006); *Tompkins v. Barker*, 2011WL3583413, at *2 (M.D. Ala. July 26, 2011).  Therefore, the individual defendants Silver, King and Todd are entitled to summary judgment as to any claim or cause of action based on Title VII.

**C. 42 U.S.C. § 1981[12]**

Section 1981, states in relevant part, as follows:

 (a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C.A. § 1981.

Section § 1981 allows claims against employers with fewer that fifteen employees.

*Thomas v. Meister Heating & Air Conditioning, Inc.,* 98 Fed. Appx. 508, 510 n. 1 (7th Cir.2004) (Section 1981 "does not set a limit on the minimum number of employees required to state a claim for employment discrimination."). Also, § 1981 allows claims against individual defendants. *See, e.g., Shotz v. City of Plantation, Fla.,* 344 F.3d 1161, 1176 (11th Cir.2003). "[A] claim for individual liability under Section 1981 requires an affirmative showing linking the individual defendant with the discriminatory action.")

**1) Discrimination in terms of employment**

---

[12] Perkins does not specifically allege in his amended complaint a claim under Title VI. However he does allege a violation of the Civil Rights Act of 1964. Although there is no individual liability under Title VI, *Shotz v. City of Plantation, Florida*, 344 F3d 1161, 1179-1171 (11th Cir. 2003), a claim is viable against the District. To the extent Perkins has alleged a Title VI claim it will be analyzed the same as his § 1981 claim against the District. *See*, *Sirpal v. University of Miami*, 509 Fed. Appx. 924, 926 (11th Cir. 2013).

Ultimately, to "establish a violation of either Title VI or § 1981" Perkins "must show that a challenged action was the result of intentional discrimination on the part of the defendant[s]". *Sirpal,* 509 Fed. Appx. at 926 (citing *Howard v. BP Oil Co., Inc.,* 32 F.3d 520, 524 n. 2 (11th Cir.1994) and *Elston v. Talladega Cnty. Bd. of Educ.,* 997 F.2d 1394, 1405–06 & n. 11 (11th Cir.1993)).  Perkins "may use direct evidence or, in the absence of direct evidence, circumstantial evidence that satisfies the *McDonnell Douglas* burden-shifting framework.[ ]" *Sirpal,* 509 Fed. Appx. at 926 (citing *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330–31 (11th Cir.1998)) (footnote omitted).

Perkins has submitted no direct evidence of discrimination based on race, therefore, Perkins must support his claims with circumstantial evidence.  In that regard, the Court applies the *McDonnell Douglas* burden-shifting framework:

> Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of presenting sufficient evidence to allow a reasonable jury to determine that he has satisfied the elements of his *prima facie* case. *Id.* at 802, 93 S.Ct. at 1824. If the plaintiff presents a *prima facie* case and the employer offers a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the stated reason is a mere pretext for unlawful discrimination. *Alvarez v. Royal Atl. Developers, Inc.,* 610 F.3d 1253, 1264 (11th Cir.2010).

*Sirpal,* 509 Fed. Appx. at 927.

To establish his prima facie case of race discrimination, Perkins must show that he was a member of a protected class, that he was qualified for the position, and that he "was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." *Barnett v. Athens Reg'l Med. Ctr. Inc.,* 550 Fed.Appx. 711, 713 (11th Cir. 2013) (citing *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1087 (11th Cir.2004)).  "To qualify as 'adverse,' an action taken must be 'a serious and material change in the terms, conditions, or privileges of employment.'" *Jest v. Archbold Medical Center, Inc.,* - - - Fed.

Appx. - - -, 2014 WL 1284871, *2 (11th Cir. Apr. 1, 2014) (citing *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1239 (11th Cir.2001)).  Perkins' "subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis,* 245 F.3d at 1239; *Grimsley v. Marshalls of MA, Inc.,* 284 Fed.Appx. 604, 608 (11th Cir.2008).

The parties do not dispute that Perkins was a member of a protected class or that he was qualified for his position.  Defendants argue that Perkins is unable to show any adverse employment action and that he cannot point to any facts to show that the defendants treated him less favorably than similarly situated white co-workers.

In response, Perkins relies on the following to establish the required adverse job action: that he was written up by Todd in December 2011, that he was singled out by King for not signing the cell phone usage policy, that his time sheets were scrutinized by King and Silver[13], his job duties and work hours were changed and he was not given a raise after he received his Water Operator license on September 1, 2012.

As to the December 2011 notice, the verbal reprimand before the Personnel Committee for failing to sign the cell phone policy, and the alleged scrutiny his time sheets received, a reasonable person could not view these actions as a "*serious and material* change in the terms, conditions, or privileges of his employment."  This is because there is no evidence that any disciplinary action was taken against Perkins or that he was subjected to any tangible

---

[13]  Perkins argues that Manley "never wrote in a time for his lunches and he was never disciplined for not doing so." (Doc. 44, p. 19)  In support, Perkins presented a copy of one of Manley's time sheets.  However, Perkins has not alleged that any disciplinary action was taken against him in regard to how he completed his time sheets.  Moreover, although Manley did not log in a specific time for his lunch, his time sheet indicates that he worked from 8:00 a.m. until 4:30 p.m.

consequence. *Davis,* 245 F.3d at 1239 (emphasis in original) (finding that "negative job performance memoranda" did not constitute an "adverse employment action" where plaintiff did not receive a "tangible consequence from the memo, in the form of loss of pay or benefits or further discipline."); *Barnett,* 550 Fed.Appx. at 713. ("We have held that 'memoranda of reprimand or counseling that amount to no more than a mere scolding, without following disciplinary action, do not rise to the level of adverse employment actions sufficient to satisfy the requirements of Title VII."); *Davis,* 245 F.3d at 1242 (a discrimination claim "rarely may be predicated merely on employer's allegedly unfounded criticism of an employee's job performance, where that criticism has no tangible impact on the terms, conditions, or privileges of employment. . . . [T]he protections of Title VII simply do not extend to everything that makes an employee unhappy.") (internal quotation marks and citation omitted); *Embry v. Callahan Eye Found. Hosp.,* 147 Fed.Appx. 819, 828-829 (11th Cir.2005) ("On the other hand, Embry's allegation that Callahan did not equitably enforce its policy requiring employees not to eat during work hours involved the fact that Elkins reprimanded her in February 2002, in part because she violated this policy. However, similar to the facts in *Davis,* Embry failed to cite to evidence showing that this reprimand resulted in her suffering any tangible consequences in the form of loss of pay or benefits, and it, thus, was not an 'adverse employment action.'") (citation omitted).

In regard to changes in duties, Perkins alleges that in late December 2011, he gave King a list of meters that he thought needed to be dug out or raised. King and Manley looked at the meters and disagreed with Perkins as to the need. King then assigned the work to Perkins. Even if this work was not initially one of Perkins' job duties, there is no evidence that King's decision to re-assign this work to Perkins' was based on his race. Moreover, there is no

evidence that this one time additional job duty resulted in a "*serious and material* change in the terms, conditions, or privileges of his employment" because the change did not affect Perkins' job status in that it was not a demotion, or change in job title, pay, or benefits. *Davis,* 245 F.3d at 1239 (emphasis in original).

In regard to changes in work hours, Perkins alleges that in May 2012, King told Perkins that he must work until 4:30 on regular workdays (non-meter reading days) and take a 30-minute lunch break. In September 2012, King, Silver and Todd signed a memorandum that formalized this change as to both Perkins and Manley and formalized a change to the hours for meter reading days. However, this change in work hours did not result in a "*serious and material* change in the terms, conditions, or privileges of his employment" because the change did not affect Perkins' job status in that it was not a demotion, or change in job title, pay, or benefits. *Davis,* 245 F.3d at 1239 (emphasis in original). Moreover, Perkins has not shown that a similarly situated employee outside his protected class was treated differently. Manley appears to be the employee most similarly situated to Perkins, but there is no evidence that he was treated more favorably concerning work hours.[14]

The failure to give a raise would be an adverse employment action. Perkins states that he was not given a raise after he obtained the Water Operator's license on September 1, 2012. Perkins states that when he was hired he had been promised by the Board he would receive the raise once he received his license. In support of his argument, Perkins cites to Exhibit XIX which appears to be his hand-written notes stating "$18 once operator status achieved". (Doc. 44, p. 39) However, to establish a prima facie case on this claim, Perkins must show that a

---

[14] Perkins did provide one <u>undated</u> time sheet signed by Manley. (Doc. 44, p. 29) On one day Manley wrote "no lunch" and worked from 7:30 until 2:30.

similarly situated employee outside his race was given a raise once an Operator's license was received. Perkins has presented no evidence that he was treated differently from a similarly situated employee, much less that it was based on his race. Perkins has only presented evidence that the Board did not keep its promise, but this alone does not establish a claim under Section 1981. Accordingly, defendants are due summary judgment on these claims.

**2) Hostile work environment based on race**

Perkins alleges that "he faced numerous cases of harassment from supervisors and co-workers" and that an "environment of hostility was persistent." He also alleges that the harassment was racially motivated. (Doc. 15, p. 2, 4) Perkins hostile work environment appears to be based on the December 2011 notice, the enforcement of the cell phone policy, the change of work hours, and the scrutiny given to his time sheets.

Specifically, Perkins states that he was the only employee required to submit time sheets that denoted a thirty-minute lunch period and that only his time sheets were scrutinized. In support, Perkins provides one un-dated time sheet signed by Manley wherein Manley did not log a time for lunch but instead logged his hours as 8:00 a.m. to 4:30 p.m. (Doc. 44, p. 29, Manley's time sheet). Other than this, Perkins provides no evidence to support his assertion.

As to the cell phone policy enforcement, Perkins believed that no one else except Manley had signed the cell phone policy. The evidence shows otherwise. Perkins also believed that the policy was enforced only as to him as the only black employee, but was not enforced as to the white employees. As support, Perkins states that he saw other employees use their personal cell phones in the presence of Superintendent King but he took no action against them. However, Perkins has presented no evidence that he was accused of violating the policy or that any personnel action was taken against him in this regard. In other words, Perkins has

not shown any actions regarding the enforcement of the cell phone policy that could be considered harassment of any kind, much less based on race, against Perkins.

As to the December 2011 write-up, Perkins believed that Todd was trying to get him fired by "stuffing [his] personnel file with bogus write up sheets." (Doc. 44, p. 14-16)  The write-ups that occurred in September 2012 were primarily for failing to abide by the new policy on work hours.  Perkins does not contend that the write-ups were not accurate, rather he contends that he should not have had to abide by the work hour policy and take lunch. Moreover, there is no evidence that the new work hours were only applied to Perkins.  An across the board enforcement of work hours can hardly be considered harassment.

The District is liable to Perkins for a racially hostile work environment if he proves that:

> (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability.

*Jones v. UPS Ground Freight,* 683 F.3d 1283, 1292 (11th Cir.2012); *Bryant v. Jones,* 575 F.3d 1281, 1296 (11th Cir.2009)* (quotation marks omitted).

The question of whether the harassment was so severe or pervasive as to alter the terms and conditions of Perkins' employment with the District requires both a subjective and an objective component. *Hooks v. Bank of Am.,* 183 Fed. Appx. 833, 836 (11th Cir.2006) (citing *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir.1999)); *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1276 (11th Cir.2002).  "Thus, to satisfy this element, [Perkins] must show that [he] subjectively perceived the harassment as severe and pervasive enough to change the terms or conditions of employment *and* present facts sufficient for the district court to find that this perception was objectively reasonable." *Hooks,* 183 Fed. Appx. at 836. (italics in original)

"In making this objective determination, the following factors should be considered: '(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.'" *Id.*

The Court finds that the incidents relied upon by Perkins are not sufficiently severe enough or pervasive enough to satisfy the "objective component of the fourth element" of Perkins' prima facie case. *Id.* at 837. (finding Hooks did not establish the objective component of the fourth element by relying upon the same incidents underlying her discrimination claim because those "incidents were not frequent, severe, or physically threatening, and Hooks admitted that none of those incidents interfered with her job"). Because Perkins has failed to make his prima facie case of hostile work environment based on race, the defendants are entitled to summary judgment as to this claim.

### 3) Constructive discharge

Perkins alleged that King was "the supervisor who made the initial discriminatory discharge" and that "the discharge decision was finally made by" the District's Board. (Doc. 15, p. 1) Perkins alleges that he "eventually resigned". (*Id.*, p. 4)

Defendants assert that the amended complaint does not state a claim for constructive discharge. However, they argue that should the Court construe such a claim, Perkins' working environment and conditions were not so intolerable that a reasonable person would have felt compelled to resign. They also argue that if an employer is not given time to remedy a situation, there is no constructive discharge. (Doc. 39, p. 22-23)

"A constructive discharge qualifies as an adverse employment action." *Menzie v. Ann Taylor Retail Inc.,* 549 Fed. Appx. 891, 894 (11thCir. 2013) (citation omitted). "To establish a

constructive discharge, a plaintiff must show that 'working conditions were so intolerable that a reasonable person in her position would have been compelled to resign.'" *Id*. at 894-895 (citation omitted). "This objective standard sets a high threshold; it requires a plaintiff to show harassment that is more severe or pervasive than the minimum level required to establish a hostile working environment." *Id*.at 895 (citing *Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1231 (11th Cir.2001)); *Bryant,* 575 F.3d at 1298. ("Establishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim"). Thus, the Eleventh Circuit has "'required pervasive conduct by employers before finding that ... a constructive discharge occurred.'" *Id.* at 895 (citing *Hipp,* 252 F.3d at 1231). Because constructive discharge requires a higher threshold than hostile work environment, the defendants are entitled to summary judgment as to any claim for constructive discharge.

### 4) Retaliation

In his amended complaint, Perkins alleged that the harassment increased when the District received his first Charge of Discrimination filed in August 2012. In an effort to broadly construe Perkins' claim of retaliation, the Court looks to his EEOC Charge of Discrimination in which Perkins stated as follows:

> On August 22, 2012, I filed charge number 420-2012-02894 against the above named employer. Since filing my charge I have been retaliated against by the employer. The employer has changed the meter reading times from 8:00 – 4:30 to 6:00 – 2:30. I was told these hours are policy; however, I am not aware of any policy that sets the time to read meters. The employer is trying to force me into using a device on the truck that I am required to stand on to read meters. This device causes me to become dizzy and has no safety harnesses. The employer will not supply a respirator when I am required to work with chlorine.

(Doc. 41-8) Giving Perkins' response a very liberal construction, he identifies the retaliatory actions as the September 2012 written Notices from Todd, which were primarily based on Perkins' failure to abide by the set work hours.

Filing an EEOC charge is a protected activity and Section 1981 prohibits retaliation against Perkins for filing an EEOC charge of discrimination. *CBOCS West, Inc. v. Humphries,* 553 U.S. 442, 457, 128 S.Ct. 1951, 1961, 170 L.Ed.2d 864 (2008). Retaliation claims brought pursuant to Section 1981 are analyzed the same as Title VII retaliation claims. *Barnett,* 550 Fed.Appx. at 714; *Anyanwu v. Brumos Motor Cars, Inc.,* 496 F. App'x 943, 945–46 (11th Cir.2012) (citing *Standard,* 161 F.3d at 1330.) ("Racial discrimination and retaliation claims are cognizable under both Title VII and 42 U.S.C. § 1981, and they 'have the same requirements of proof and use the same analytical framework.'").

Perkins has not alleged any direct evidence of retaliation based on race. Where there is no direct evidence, the *McDonnell Douglas* analytical framework for evaluating circumstantial evidence applies. *Bryant,* 575 F.3d at 1307. "Under this framework, a plaintiff alleging retaliation must first establish a *prima facie* case by showing that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse action." *Id.* at 1307–08. An adverse employment action in the retaliation context is an act that would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 64, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006). Thus, it is not limited to retaliatory actions that affect the terms and conditions of employment. *Id.* at 68, 126 S.Ct. at 2412-2413. However, the "materiality of the alleged adverse action is judged by an objective standard." *Foshee v. Ascension Health-IS, Inc.*, 384 Fed.Appx.890, 892 (11th Cir. 2010).

If Perkins makes his "*prima facie* case of retaliation, the burden of production shifts" to the defendants "to rebut the presumption by articulating a legitimate, nondiscriminatory reason

for the adverse employment action." *Bryant, 575 F.3d at 1308*.  If they carry this burden of production, the burden shifts to Perkins to demonstrate that the defendants' proffered reason was a pretext for discrimination and that the plaintiff's protected activity was the "but-for" cause of the adverse action.  *Mealing v. Georgia Dept. of Juvenile Justice, ---* Fed.Appx. ----, 2014 WL 1613206, *5 (11th Cir. Apr. 23, 2014) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. ——, ——, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013)* (holding that the plaintiff must demonstrate that his protected activity was the "but-for" cause of the adverse employment decision); *see also Perry v. Alabama Alcoholic Beverage-Control Bd.*, - - - F. Supp. - - -, 2013 WL 5347403, *28 (M.D. Ala. Sept. 23, 2013) ("Recently, the Supreme Court has declared that the ultimate issue is whether the retaliation would not have occurred but for the protected conduct" and that "[e]ven if any of the alleged discrete actions of retaliation were sufficient to make out a prima facie case, they would not survive the 'but-for' test" based on the Supreme Court's clarification that the "level of causation" requires plaintiffs to show that the adverse employment action would not have occurred but for the plaintiff's involvement with protected activity").

Assuming for purpose of retaliation only, that Perkins has made his prima facie case, he has failed to show that the written Notices would not have issued "but for" his protected activity.  Review of the written Notices indicates that Perkins was late two mornings, did not use the "reader's platform", and did not take his lunch break while on the meter reading route but instead left work at 2:30 p.m. (Doc. 44, p. 22-28)  Perkins does not dispute that he committed the actions noted in the write-ups.  He also does not dispute that his supervisors Todd and King and Board Chair Silver changed his hours and gave him notice of this change. Instead, he quibbles with their authority to change his hours.  Since Perkins violated the

specific terms of employment applicable to both Manley and him, Perkins has failed to

establish that the written Notices would not have occurred but for his filing the EEOC in

August 2012. *Mealing,* --- Fed.Appx. ----, 2014 WL 1613206, *7 (applying the "but for"

analysis at the final step of the *McDonnell Douglas* analysis). Because Perkins has failed to

establish that "but for" filing the EEOC charge, he would not have received these written

Notices, the defendants are entitled to summary judgment as to this claim for retaliation.

### V. The convincing mosaic analysis

Additionally, the McDonnell–Douglas "framework is not, and never was intended to be,

the sine qua non for a plaintiff to survive a summary judgment motion in an employment

discrimination case." *Smith v. Lockheed–Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir.2011).

Thus Perkins' claims may proceed to trial "if the record, viewed in a light most favorable to

[him], presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer

intentional discrimination by the decisionmaker.' " *Id*. (internal citations and footnote omitted);

*see also Chapter 7 Trustee v. Gate Gourmet, Inc.,* 683 F.3d 1249, 1255–56 (11th Cir.2012)

(applying Smith in holding that an employee "d[id] not have to use the McDonnell–Douglas

framework to survive summary judgment because the record contain[ed] enough non-

comparator evidence for a jury to reasonably infer that [her supervisor] discriminated against

[her] because she was pregnant").

An overall review of the facts, viewed in the light most favorable to Perkins shows that

he has failed to present sufficient evidence to create a convincing mosaic of circumstantial

evidence from which a jury could reasonably infer that defendants discriminated on basis of

race or retaliated against Perkins for filing the EEOC charges.

**VI. Conclusion**[15]

Upon consideration of the evidence and for the reasons set forth herein, the Court finds that the individual defendants and the District are entitled to judgment as a matter of law. *See McDowell v. Brown*, 392 F.3d 1283, 1288 (11th Cir. 2004) (having resolved all issues of material fact in favor of the non-movant, the court must "then determine the legal question of whether the [movant] is entitled to judgment as a matter of law under that version of the facts.") (citation omitted). Accordingly, the motion for summary judgment is **GRANTED**.

Judgment shall be entered by separate document as provided in Rule 58 of the Federal Rules of Civil Procedure.

DONE and ORDERED this the 14th day of May 2014.

s/  Kristi K. DuBose
KRISTI K. DuBOSE
UNITED STATES DISTRICT JUDGE

---

[15] The practice of filing motions to reconsider has become commonplace. Considering the heightened burden that must be met for the Court to reconsider, the Court has found most such motions to be a waste of the Court's and the parties' resources.